ORIGINAL

Sarah P. Alexander (CA Bar No. 291080)
WHISTLEBLOWER PARTNERS LLP
1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel: (415) 707-6867
poppy@whistleblower.law

Brian Olney (CA Bar No. 298089)
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, CA 91103
Tel: (626) 585-9600
bolney@hadsellstormer.com

Jeffrey A. Newman, Esq. (MA Bar No. 370450)
(*Pro Hac Vice* forthcoming)
JEFF NEWMAN LAW
One Story Terrace
Marblehead, MA 01945
Tel: (617) 823-3217
jeff@jeffnewmanlaw.com

*Attorneys for Relator*

FILED
CLERK, U.S. DISTRICT COURT
DEC 10 2025
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION AP BY DEPUTY

FEE PAID

FAXED

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

EDCV25-03330-JGB(SPx)

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA ex rel. GERARDO MENDOZA<br><br>Plaintiff-Relator,<br>v.<br>PHYSICAL THERAPY-SPORTS INSTITUTE, INC. and PROMISECARE MANAGEMENT SERVICES, LLC f/k/a KM STRATEGIC MANAGEMENT, LLC<br>Defendants. | Civil Action No. __________<br><br><u>RELATOR'S COMPLAINT AND DEMAND FOR JURY TRIAL</u><br><br>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br>DO NOT ENTER INTO PACER<br>DO NOT ENTER IN CM/ECF<br>DO NOT PLACE IN PRESS BOX |

# FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

## I. PRELIMINARY STATEMENT

1. This is an action by Relator Gerardo Mendoza ("Relator") against Physical Therapy-Sports Institute, Inc. ("PTSI") and PromiseCare Management Services LLC f/k/a KM Strategic Management, LLC ("PromiseCare/KM") (collectively, "Defendants") to recover damages and civil penalties under the federal False Claims Act ("FCA"), 31 U.S.C §§ 3729 *et seq*., and the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq*.

2. Relator is a physical therapy aide at PTSI. PTSI is an outpatient physical therapy clinic. PromiseCare/KM is a medical management company. Both PTSI and PromiseCare/KM are under the umbrella of PromiseCare Medical Group, Inc. f/k/a Hemet Community Medical Group, Inc. ("PromiseCare/HCMG"), an Independent Provider Association ("IPA") offering a network of primary care doctors, specialists, urgent care clinics, imaging and diagnostic centers, and hospitals in California.

3. As more fully alleged herein, this action arises out of Defendants' knowing fraudulent practices which caused Medicare, California Medicaid ("Medi-Cal"), Medicare Advantage Organizations, Medicaid Managed Care Organizations, TRICARE, and CHAMPVA (collectively, "Healthcare Programs") to pay for services that did not occur as Defendants reported them to have occurred.

4. Defendants knowingly submitted, or caused submission of, false claims, and/or knowingly made, or caused to be made, false statements material to false claims and/or material to an obligation to pay or transmit money, and/or knowingly concealed, avoided, or decreased an obligation to pay or transmit money, to Healthcare Programs by:

- Billing for physical therapy services rendered independently by physical therapy aides—aides are not licensed, not authorized to perform such services, not required to meet any education requirements, and have no formal training—as if the services were rendered by a licensed physical therapist. Physical therapists were not even in the same room while aides were

independently treating patients. Services rendered by aides are not covered; and

- Billing direct, one-on-one CPT codes, instead of group CPT codes, for outpatient physical therapy services provided at the same time to two or more patients.

5. Internal company documents show that PTSI scheduled as many as 22-25 patients per therapist per day and billed over 12 hours of direct one-on-one therapy codes *plus* additional time for patient evaluations, in the 9.5-hour period of 7:30 a.m. to 5 p.m. (which includes break time). Mathematically, this is not possible without billing for treatments rendered by aides and/or treating multiple patients at the same time. Oftentimes, both occurred. Defendants billed one-on-one therapy codes when aides treated multiple patients at the same time.

6. Defendants have knowingly and purposefully engaged these practices to increase profits and maximize reimbursement. When CMS/Medi-Cal conducted a site visit on July 30, 2025, PTSI engaged several protocols in preparation for the visit to hide its practices. Internal communications instructed rendering one-on-one treatment to Medicare and Medi-Cal patients and required physical therapists to be present in the therapy gym to supervise aides during the CMS/Medi-Cal visit. Following the CMS/Medi-Cal visit, Defendants enacted certain changes to appear compliant. However, in practice, at least some of the wrongful practices are ongoing.

7. Defendants have engaged in these practices for several years and these practices were well established when Relator started working at PTSI as an aide in 2023.

## II. JURISDICTION AND VENUE

8. This action arises under the FCA, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345. Supplemental jurisdiction for Count IV arises under 28 U.S.C. § 1367 because these claims are so related to the federal

claims that together they form part of the same case or controversy under Article III of the U.S. Constitution.

9. At all times material to this Complaint, Defendants regularly conducted substantial business within the State of California, Defendants maintained permanent employees and offices in California, and/or Defendants made and are making significant revenue within California. Defendants are thus subject to personal jurisdiction in California.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendants are located within Riverside County, California and conduct business in California.

## III. FILING UNDER SEAL

11. Under the FCA, this Complaint is to be filed in camera and remain under seal for a period of at least sixty days, and shall not be served on Defendants until the Court so orders.

12. As required by the FCA, Relator voluntarily submitted, prior to the filing of this Complaint, a confidential pre-filing disclosure statement (subject to the attorney-client, work product, and common-interest privileges) to the United States and the State of California containing materials, evidence, and information in his possession pertaining to the allegations contained in this Complaint.

## IV. PARTIES

13. The real party in interest as Plaintiffs are the United States of America and the State of California.

### A. Relator Gerardo Mendoza

14. Relator Gerardo Mendoza is a resident of the State of California. Since October 2023, he has been working as a Physical Therapy Aide at PTSI. He is employed by PromiseCare/KM, the entity that issues his paychecks. Relator does not hold a degree

in physical therapy, exercise science, or related fields, and is not pursuing such a degree. He is trained as a firefighter/EMT.

**B. Defendant Physical Therapy-Sports Institute, Inc.**

15. Defendant PTSI is a California corporation with its principal place of business at 1545 W Florida Ave., Hemet, CA 92543. Its office is located at 1515 W Florida Ave., Ste E, Hemet, CA 92543. PTSI provides outpatient physical therapy services and is a part of the PromiseCare/HCMG network. Michael Foutz[1] is its Chief Executive Officer, President, Chief Financial Officer, and Secretary. Jeanne Sprinkle manages the operations at PTSI, as well as at other clinics in the PromiseCare/HCMG network.

16. PTSI changed its name from Physical Therapy-Sports Institute, Dennis L. Rohrig, P.T. & Associates, Inc. in June 2012. The Certificate of Amendment changing the entity's name was signed by Michael Foutz.

**C. Defendant PromiseCare Management Services, LLC f/k/a KM Strategic Management, LLC**

17. Defendant PromiseCare/KM is organized under the laws of the State of California. Its principal place of business is 1545 W Florida Ave., Hemet, CA 92543. This is the same address as PTSI.[2] Michael Foutz is listed as a Member.

18. PromiseCare/KM is a medical management company in the PromiseCare/HCMG network. *See* KM Strategic Management https://kmsm.com/. Staff at PTSI—including Jeanne Sprinkle who manages the operations at PTSI—are employed by PromiseCare/KM.

## V. RELEVANT LAW

**A. The Federal False Claims Act**

19. The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

---

[1] Michael Foutz is also the Chief Financial Officer at PromiseCare/HCMG.

[2] It is also the same address as the principal place of business of PromiseCare/HCMG.

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> […]
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

*See* 31 U.S.C. § 3729(a)(1).[3]

20. For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

21. The False Claims Act defines the term "claim," in pertinent part, as

> "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]"

---

[3] Civil penalties assessed after July 3, 2025 range from $14,308 to $28,619. *See* 28 C.F.R. § 85.5 (last amended July 3, 2025).

*See* 31 U.S.C. § 3729(b)(2)(A).

22. For purposes of the False Claims Act, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *See* 31 U.S.C. § 3729(b)(4).

**B. The California False Claims Act**

23. The California False Claims Act provides, in pertinent part, that any person who:

> (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.
>
> […]
>
> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.
>
> (8) Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

shall be liable to the state or to the political subdivision for three times the amount of damages plus a civil penalty of $5,500-11,000 for each violation, as adjusted for inflation. *See* Cal. Gov't Code § 12651(a).

24. For purposes of the California False Claims Act, the terms "knowing" and "knowingly" mean that "a person, with respect to information, does any of the following: (A) Has actual knowledge of the information; (B) Acts in deliberate ignorance of the truth or falsity of the information; (C) Acts in reckless disregard of the truth or falsity of the information. Proof of specific intent to defraud is not required." *Id.* at § 12650(b)(3).

25. The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money, property, or services." *Id.* at § 12650(b)(4).

26. The term "claim" means:

> any request or demand, whether under a contract or otherwise, for money, property, or services, and whether or not the state or a political subdivision has title to the money, property, or services that meets either of the following conditions:
>
> (A) Is presented to an officer, employee, or agent of the state or of a political subdivision.
>
> (B) Is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions:
>
> > (i) Provides or has provided any portion of the money, property, or service requested or demanded.
> >
> > (ii) Reimburses the contractor, grantee, or other recipient for any portion of the money, property, or service that is requested or demanded.

*Id.* at § 12650(b)(1).

### C. Medicare Laws, Rules, and Regulations

27. Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program.

28. In order to bill Medicare, non-institutional providers submit a claim on a form CMS-1500 or its electronic counterpart, 837P. In submitting a CMS-1500 form, the provider certifies that:

> 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program

> instructions, which are available from the Medicare contractor; [...] 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE . . . .

29. In order to bill Medicare, institutional providers submit a claim on a form CMS-1450 (UB-04) or its electronic counterpart, 837I. In submitting a CMS-1450 form, the provider certifies that:

> THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARTY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S). . . . Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. . . . For TRICARE Purposes: (a) The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically necessary and appropriate for the health of the patient . . . .

30. All healthcare providers must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare.

31. Medicare reimburses only for reasonable and necessary medical services furnished to beneficiaries, and Medicare regulations bar payment for services that are not reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k).

32. Part B of the Medicare program authorizes payment of federal funds for medical and other health services, including outpatient physical therapy services such as those provided by Defendants. *See generally* CMS, *Medicare Benefit Policy Manual*, Ch.

15 (issued Apr. 11, 2025), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf, and *see specifically id.* §§ 220, 230.

*i.* *Services by physical therapy aides are not covered*

33. "Medicare Part B pays for outpatient physical therapy services only if they are furnished by an individual meeting the qualifications [in 42 C.F.R. § 484.4] for a physical therapist or an appropriately supervised physical therapist assistant" under certain conditions. *See* 42 C.F.R. § 410.60(a).

34. "Services provided by aides, even if under the supervision of a therapist, are **not** therapy services and are **not** covered by Medicare. Although an aide may help the therapist by providing unskilled services, those services that are **unskilled** are not covered by Medicare and shall be denied as not reasonable and necessary if they are billed as therapy services." *See Medicare Benefit Policy Manual*, Ch. 15, § 230.1(C) (emphasis added).

35. Aides are not considered "qualified personnel" for billing for physical therapy services. "You **cannot** bill Medicare for the services of an aide that is supervised by the therapist or therapy assistant. Medicare Part B does not pay for the services provided by aides regardless of the level of supervision. Medicare pays only for skilled, medically necessary services delivered by qualified individuals, including therapists and appropriately supervised therapy assistants." *See* CMS, *11 Part B Billing Scenarios for PTs and OTs* (reviewed Sept. 2009), https://www.cms.gov/medicare/billing/therapyservices/downloads/11_part_b_billing_scenarios_for_pts_and_ots.pdf, at 5 (emphasis in original).

*ii.* *Billing for outpatient physical therapy services*

36. "Section 1834(k)(5) of the Act requires that all claims for outpatient rehabilitation therapy services" be reported using Healthcare Common Procedure Coding System/Current Procedural Terminology ("HCPCS/CPT") codes. "The Medicare physician fee schedule ('MPFS') is used to make payment for these therapy services at the non-facility rate." *See* CMS, *Medicare Claims Processing Manual*, Ch. 5, § 20(A) (issued Nov. 22, 2021), https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c05.pdf.

37. "Therapy services are payable under the [MPFS] when furnished by 1.) a provider to its outpatients in the patient's home; 2.) a provider to patients who come to the facility's outpatient department; 3.) a provider to inpatients of other institutions, or 4.) a supplier to patients in the office or in the patient's home. (CORF rules differ on providing therapy at home.)" *See Medicare Benefit Policy Manual*, Ch. 15, § 220.1.4.

38. "Modifiers are used to identify therapy services. . . ." "GP" signifies services "delivered under an outpatient physical therapy plan of care." *See Medicare Claims Processing Manual*, Ch. 5, § 20.1.

39. "When reporting service units for HCPCS codes where the procedure is not defined by a specific timeframe ('untimed' HCPCS), the provider enters '1' in the field labeled units. For timed codes, units are reported based on the number of times the procedure is performed, as described in the HCPCS code definition." *Id.* at § 20.2.

40. "Several CPT codes used for therapy modalities, procedures, and tests and measurements specify that the direct (one on one) time spent in patient contact is 15 minutes. Providers report these 'timed' procedure codes for services delivered on any single calendar day using CPT codes and the appropriate number of 15-minute units of service. . . . When only one service is provided in a day, providers should not bill for services performed for less than 8 minutes. For any single timed CPT code in the same day measured in 15-minute units, providers bill a single 15-minute unit for treatment greater

than or equal to 8 minutes through and including 22 minutes. If the duration of a single modality or procedure in a day is greater than or equal to 23 minutes, through and including 37 minutes, then 2 units should be billed. Time intervals for 1 through [5] units are as follows:

- 1 unit: ≥ 8 minutes through 22 minutes
- 2 units: ≥ 23 minutes through 37 minutes
- 3 units: ≥ 38 minutes through 52 minutes
- 4 units: ≥ 53 minutes through 67 minutes
- 5 units: ≥ 68 minutes through 82 minutes
- […]

The pattern remains the same for treatment times in excess of [82 minutes].” *Id.* at § 20.2 (emphasis omitted).

41. Providers must “report the code for the time actually spent in the delivery of the modality requiring constant attendance and therapy services. Pre- and post-delivery services are not to be counted in determining the treatment service time. In other words, the time counted as ‘intra-service care’ begins when the therapist or physician (or an assistant under the supervision of a physician or therapist) is directly working with the patient to deliver treatment services. The patient should already be in the treatment area (e.g., on the treatment table or mat or in the gym) and prepared to begin treatment.” *Id.* at § 20.3.

42. “In the same 15-minute (or other) time period, **a therapist cannot bill any of the following pairs of CPT codes for outpatient therapy services provided to the same, or to different patients**. Examples include:

a. **Any two CPT codes for “therapeutic procedures” requiring direct one-on-one patient contact (CPT codes 97110-97542);**

b. Any two CPT codes for modalities requiring “constant attendance” and direct one-on-one patient contact (CPT codes 97032-97039);

c. Any two CPT codes requiring either constant attendance or direct one-on-one patient contact - as described in (a) and (b) above -- (CPT codes 97032- 97542). For example: any CPT code for a therapeutic procedure (eg. 97116-gait training) with any attended modality CPT code (eg. 97035-ultrasound);

d. Any CPT code for therapeutic procedures requiring direct one-on-one patient contact (CPT codes 97110 - 97542) with the group therapy CPT code (97150) requiring constant attendance. For example: group therapy (97150) with neuromuscular reeducation (97112);

e. Any CPT code for modalities requiring constant attendance (CPT codes 97032 -97039) with the group therapy CPT code (97150). For example: group therapy (97150) with ultrasound (97035);

f. Any untimed evaluation or reevaluation code (CPT codes 97001-97004) with any other timed or untimed CPT codes, including constant attendance modalities (CPT codes 97032-97039), therapeutic procedures (CPT codes 97110-97542), and group therapy (CPT code 97150)."

*See 11 Part B Billing Scenarios for PTs and OTs*, at 2 (emphasis added).

43. "When **direct one-on-one patient contact** is provided, the therapist bills for individual therapy, and **counts the total minutes of service to each patient** in order to determine how many units of service to bill each patient for the timed codes. These direct one-on-one minutes may occur continuously (15 minutes straight), or in notable episodes (for example, 10 minutes now, 5 minutes later). Each direct one-on-one episode, however, should be of a sufficient length of time to provide the appropriate skilled treatment in accordance with each patient's plan of care. Also, the manner of practice should clearly distinguish it from care provided simultaneously to two or more patients." *Id.* at 3 (emphasis added).

44. "Group therapy consists of simultaneous treatment to two or more patients who may or may not be doing the same activities. If the therapist is dividing attention

among the patients, providing only brief, intermittent personal contact, or giving the same instructions to two or more patients at the same time, it is appropriate to bill each patient one unit of group therapy, 97150 (untimed)." *Id.*

45. CMS provides the following examples to clarify the above requirements:

> a. **One-on-One Example**: In a 45-minute period, a therapist works with 3 patients - A, B, and C - providing therapeutic exercises to **each patient with direct one-on-one contact** in the following sequence: Patient A receives 8 minutes, patient B receives 8 minutes and patient C receives 8 minutes. After this initial 24-minute period, the therapist returns to work with patient A for 10 more minutes (18 minutes total), then patient B for 5 more minutes (13 minutes total), and finally patient C for 6 additional minutes (14 minutes total). During the times the patients are not receiving direct one-on-one contact with the therapist, they are each exercising independently. The therapist appropriately bills each patient one 15 minute unit of therapeutic exercise (97110) corresponding to the time of the skilled intervention with each patient.
>
> b. **Group Example:** In a 25-minute period, a therapist works with two patients, A and B, and **divides his/her time between two patients**. The therapist moves back and forth between the two patients, spending a minute or two at a time, and provides occasional assistance and modifications to patient A's exercise program and offers verbal cues for patient B's gait training and balance activities in the parallel bars. The therapist does not track continuous or notable, identifiable episodes of direct one-on-one contact with either patient and would bill each patient one unit of group therapy (97150) corresponding to the time of the skilled intervention with each patient.

*Id.* (emphasis added).

*iii.* *Reimbursement for outpatient physical therapy services*

46. Medicare reimbursement varies by CPT code and locality of service. The table below shows reimbursement for the physical therapy CPT codes at issue in the Riverside/San Bernardino area in California in 2025. *See* CMS, *Physician Fee Schedule* (last updated July 1, 2025), https://www.cms.gov/medicare/physician-fee-schedule/search.

| **CPT code** | **Description** | **Non-facility Price Riverside/San Bernardino** |
|---|---|---|
| 97110 | Therapeutic Exercises | $30.25 |
| 97112 | Neuromuscular Reeducation | $33.66 |
| 97140 | Manual Therapy 1/> regions | $28.53 |
| 97530 | Therapeutic Activities | $36.64 |
| 97535 | Self-care Management Training | $33.79 |
| 97116 | Gait Training Therapy | $30.25 |
| 97150 | Group Therapeutic Procedures | $18.29 |

## D. California Medicaid Rules and Regulations

47. California Medicaid, known as Medi-Cal, covers physical therapy services "contingent upon compliance with the following requirements:

> (A) There is direct and specific relationship of the services to written treatment plan prescribed by the physician, dentist or podiatrist after consultation with a qualified physical therapist.
>
> (B) The complexity and sophistication of the level of service or condition of the beneficiary requires the judgment, knowledge and skills of a physical therapist.
>
> (C) Provision of the services is with the expectation that the beneficiary will improve significantly in a reasonable and generally predictable period of time or to establish an effective maintenance program in connection with a specific disease state.
>
> **(D) Service is to be performed by a qualified physical therapist who meets the standards set forth in Section 51201.1 of this chapter.**
>
> (E) The service is considered, under accepted standards of medical practice, to be a specific and effective treatment for the beneficiary's condition.
>
> (F) The service is reasonable and medically necessary for the treatment of the beneficiary's condition."

*See* Cal. Code Regs. tit. 22, § 51309(d)(2) (emphasis added).

48. Section 51201.1 defines a physical therapist as:

> licensed as a Registered Physical Therapist by the California Board of Medical Quality Assurance, or similarly registered or licensed by a comparable agency in the state in which the therapist practices, and . . . a graduate of a program in physical therapy approved by the agency or organization recognized by the Council on Post Secondary Accreditation or the U.S. Department of Education, or its equivalent. Physical therapists certified by the Physical Therapy Examining Committee may perform tissue penetration for the purpose of evaluating neuromuscular performance.

49. Under Medi-Cal, "[s]ervices which do not require the skills of a physical therapist shall not be covered or authorized." *See* Cal. Code Regs. tit. 22, § 51309(d)(3).

**A. TRICARE Rules and Regulations**

50. TRICARE (formerly known as CHAMPUS) is the Department of Defense's healthcare program for servicemembers and their families, National Guard/reserve members and their families, survivors, former spouses, Medal of Honor recipients and their families, and others registered in the Defense Enrollment Eligibility Reporting System.

51. TRICARE covers "outpatient physical therapy services that are determined to be medically necessary for the treatment of a covered condition, and that are directly and specifically related to an active written regimen." *See* Defense Health Agency, *TRICARE Policy Manual*, Ch. 7, § 18.2, para. 3.1 (issued Apr. 1, 2015), https://manuals.health.mil/DisplayManualPdfFile/2015-04-01/AsOf/TP15/c7s18_2.pdf#G51057.

52. "TRICARE covers physical therapy when: [p]rovided by [a] licensed physical therapist, [a] physical therapist assistant performing under the supervision of a TRICARE-authorized physical therapist, [a]n occupational therapist, an occupational therapist assistant performing under the supervision of a TRICARE-authorized occupational therapist, [a] certified nurse practitioner, [or a] podiatrist." *See Physical Therapy*, TRICARE (last updated Oct. 29, 2024),

https://tricare.mil/CoveredServices/IsItCovered/PhysicalTherapy; *see also* Defense Health Agency, *TRICARE Policy Manual*, Ch. 11, § 3.16 (Change 62, Apr. 22, 2020), https://manuals.health.mil/pages/DisplayManualHtmlFile/2020-04-22/AsOf/TP15/C11TOC.html (change allowing physical therapy assistants to render services under the supervision of a physical therapist). Notably, physical therapy services rendered by an aide are not listed.

53. "Reimbursement for covered physical therapy services is based on the appropriate CPT procedure codes for the services billed on the claim." *See TRICARE Policy Manual*, Ch. 7, § 18.2, para 3.4 (issued Apr. 1, 2015). "TRICARE is required by law to reimburse like Medicare where practicable (10 U.S.C. § 1079(h))." *See TRICARE Policy Manual*, Ch. 11, § 3.16, para 5.1 (Change 62, Apr. 22, 2020).

**E. CHAMPVA Rules and Regulations**

54. CHAMPVA is a Department of Veterans Affairs healthcare program providing health benefits to the spouse, surviving spouse, and children of disabled or deceased disabled veterans.

55. CHAMPVA covers "inpatient or outpatient physical therapy services for the treatment of a covered condition and that are directly and specifically related to an active written regimen. Physical therapy services must be prescribed by a physician, podiatrist certified physician assistant (PA), or a certified nurse practitioner (NP), and professionally administered to aid in the recovery from disease or injury to help the patient in attaining greater self-sufficiency, mobility, and productivity through exercises and other modalities intended to improve muscle strength, joint motion, coordination, and endurance. . . . Physical therapy performed by a chiropractor is covered if the chiropractor is a licensed, registered physical therapist or, the chiropractor is a MD (Doctor of Medicine) or DO (Doctor of Osteopathy) who holds a valid medical license." *See* Dep't of Veterans

Affairs, *CHAMPVA Operational Policy Manual*, Ch. 2, § 30.1 (last updated Jun. 26, 2025), https://www.vha.cc.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001036/content/554400000009245/023001-PHYSICAL-MEDICINE-THERAPY.

56. CHAMPVA covers rehabilitative services rendered by an authorized provider and provided at a skilled level. *Id.* at § 30.15 (last updated Jul. 19, 2021), https://www.vha.cc.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001036/content/554400000009369/023015-REHABILITATION-GENERAL.

**F. The Medicare Advantage Program and Medicaid Managed Care Organizations**

57. While Defendants submitted or caused the submission of many of their false claims directly to federal healthcare programs (such as Medicare or Medicaid), Defendants also submitted or caused the submission of false claims indirectly to Medicare via private Medicare Advantage plans and to California Medicaid via private Medicaid managed care organizations ("Medicaid MCOs").

58. Under the managed care model, the government pays a private insurance company a per-patient per-month fee to provide health benefits to beneficiaries of government health insurance programs such as Medicare Advantage or Medicaid MCOs.

59. In 2009, Congress amended the FCA to make clear that it applies to claims to entities such as Medicare Advantage plans or Medicaid MCOs that are funded by the government. Specifically, the FCA now provides that the term "claim"—

> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> > (i) is presented to an officer, employee, or agent of the United States; or
> >
> > **(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the**

> **Government's behalf or to advance a Government program or interest**, and if the United States Government—
>
> (I) provides or has provided any portion of the money or property requested or demanded; or
>
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded

*See* 31 U.S.C. § 3729(b)(2) (emphasis added).

60. The Senate Report for the 2009 FCA amendments explained that this "section of the bill clarifies that liability under section 3729(a) attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." S. Rep. 111-10, at 11 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 438.

### G. California Business and Professional Code

61. A "physical therapy aide" is "an unlicensed person, at least 18 years of age, who aids a licensed physical therapist consistent with subdivision (b)." Cal. Bus. & Prof. Code § 2630.4(a).

62. "The aide shall at all times be under the supervision of the physical therapist. An aide shall **not** independently perform physical therapy or any physical therapy procedure." *Id.* at § 2630.4(b) (emphasis added).

63. "Physical therapy aides shall not be independently supervised by a physical therapist license applicant, as defined in Section 2639, or a physical therapist student, as defined in Section 2633.7." *Id.* at § 2630.4(c).

## VI. DEFENDANTS' WRONGDOING

64. Defendants wrongfully bill and billed for physical therapy services rendered independently by physical therapy aides—who are not licensed, not required to meet any education requirements, and have no formal training—as if the services had been rendered

by licensed physical therapists. This is done to maximize profits as hiring aides is cheaper than hiring licensed physical therapists. Physical therapy services rendered by aides are not skilled services and are not covered. *See* paragraphs 33-35 herein. Furthermore, Defendants wrongfully bill and billed direct, one-on-one CPT codes for outpatient physical therapy services provided at the same time to two or more patients. This is wrongful. *See* paragraphs 40-43 herein. Sometimes, the aides were the ones treating multiple patients at the same time, but Defendants billed one-on-one therapy codes for the visits. This is done to increase reimbursement as billing for multiple direct, one-on-one therapy codes at the same time is more profitable than billing for group therapy.

### A. PTSI's operations

65. The majority of PTSI's patients are referrals from providers within the PromiseCare/HCMG network.[4]

66. Three physical therapists (Dianne Smith,[5] Michelle Brown, and Maria Montero),[6] one physical therapy assistant (Julie-Ann Cuadros), and six aides (Danber De Los Santos, Relator, Jonathan Short,[7] Alyse Cubain, Litzy Gonzalez, and Elizabeth Mendoza[8]) have worked at PTSI during the time Relator has worked there. A professional license search on the California Department of Consumer Affairs – Physical Therapy Board (https://search.dca.ca.gov/) confirms the licenses of Dianne Smith, Michelle Brown, Maria Montero and Julie-Ann Cuadros in California; and further confirms that Danber De Los

---

[4] As a result, many patients have SCAN – PromiseCare HCMG, a Medicare Advantage plan. SCAN is a health insurance provider in various states that offers Medicare Advantage plans.

[5] Dianne Smith, PT recently retired. Her last day at PTSI was in June 2025. She worked at PTSI before it was acquired by PromiseCare/HCMG and its name changed in or about 2012.

[6] Charles Schelly, D.C. also works at PTSI. He is a chiropractor. He operates independently by maintaining and treating his own patients.

[7] Jonathan Short is a former aide at PTSI. His last day was in October 2025.

[8] Elizabeth Mendoza is a former aide at PTSI.

Santos, Relator, Jonathan Short, Alyse Cubain, Litzy Gonzalez, and Elizabeth Mendoza do not hold physical therapist or physical therapist assistant licenses. Relator and Jonathan Short work/worked under Michelle Brown, PT; Alyse Cubain and Litzy Gonzales work under Maria Montero, PT. Multiple aides rendering physical therapy are assigned to a single physical therapist on a given day. Danber De Los Santos performs modalities with patients, trains and supervises aides, and performs clerical duties.

67. Daily schedules show that physical therapists at PTSI are scheduled to treat up to four patients per hour. Physical therapy appointments are scheduled every 15 minutes (highlighted in green on the schedules). Therapy evaluations are scheduled for 45 minutes, often two evaluations per day (usually highlighted in blue on the schedules). PTSI is open Monday through Friday, from 7:30 a.m. to 5 p.m. PTSI is closed daily between 12 p.m. and 1 p.m., during which time no appointments are scheduled (highlighted in pink on the schedules).

68. Daily schedules show that physical therapists are scheduled to see as many as 22-25 patients a day (treatment visits and about two (2) evaluations in a day). Patient records show, and Relator's observations support, that PTSI billed, on average, three (3) units per patient treatment visit. According to the timed procedure code requirements described in paragraph 40 herein, billing three (3) units is equal to rendering 38-52 minutes of physical therapy per patient. This means that PTSI billed as many as 60 units, or over 12 hours,[9] of direct one-on-one therapy codes[10] *plus an additional* 1.5 hours of evaluation time,[11] in the 9.5-hour period of 7:30 a.m. to 5 p.m. (including break time). This is shown, for example, in Dianne Smith's schedule on 5/28/2025; Dianne Smith's schedule on

---

[9] This is based on seeing 22 patients/day (20 treatment visits and two (2) evaluation visits). PTSI billed additional units, and more time, for any additional patients scheduled on a given day.

[10] 20 treatment visits x 38 minutes *minimum* time for three units = 760 minutes, or ~12 hours and 36 minutes.

[11] 2 patient evaluations/day x 45 minutes/each = 90 minutes, or 1.5 hours.

5/28/2024 (25 patients: *at least*[12] 23 treatment visits and two (2) evaluations); Dianne Smith's schedule on 5/30/2024 (21 patients: *at least* 19 treatment visits and two (2) evaluations); Maria Montero's schedule on 5/21/2025 (21 patients: 19 treatment visits and two (2) evaluations); and Michelle Brown's schedule on 5/22/2025 (18 patients: 16 treatment visits and two (2) evaluations).

69. Mathematically, this is not possible without billing for services rendered by physical therapy aides and/or treating multiple patients at the same time. Oftentimes, both occurred. Defendants billed one-on-one therapy codes when aides treated multiple patients at the same time.

70. At PTSI, physical therapists evaluate new patients and create the treatment plan. Physical therapists document the treatment plan in the patients' records in the NextGen electronic medical records system. Thereafter, aides treat patients on an ongoing basis by performing therapy exercises (CPT code 97110). This includes instructing on and assisting with isometric quadriceps exercises for strengthening and improving knee extension, performing bridges and sit-to-stand exercises to improve abdominal and gluteal strength, using the cable pulley system to improve strength for various body regions, using the N-K table for lower extremity exercises, etc. During these exercises, aides render verbal and tactile cues to patients to maneuver and position patients as needed to perform the exercises. Aides also perform modalities, such as applying transcutaneous electrical nerve stimulation ("TENS") or heat/cold packs on patients. Aides also transfer patients, including fall risk patients, in between equipment, etc.

71. Physical therapists briefly meet with patients at some point during the treatment visits to question patients on their condition, pain levels, improvements, etc. However, while aides are rendering treatment to patients in the therapy gym, physical

---

[12] A downward arrow on the calendar indicates multiple patients scheduled for the same time slot.

therapists may not be in the gym at all; physical therapists are evaluating other patients in separate evaluation rooms or documenting visit notes in the therapists' office outside the gym. If a patient also requires gait training (CPT code 97116) or manual therapy (CPT code 97140) in addition to therapy exercises rendered by the aides, physical therapists render such additional services to patients. Most patients at PTSI do not require additional gait training or manual therapy.

72. PTSI therapists and aides document patient visits on Flow Sheets. Before the patient's first visit, physical therapists note how many sets of a particular exercise/activity/treatment are to be performed during the visit. On the day of the visit, aides note the patient's therapy start and end time, and the exercise/activity/treatment performed under the "THER-EX (97110)" section, and sign their initials. The aide listed on the Flow Sheet is the one who treated the patient. Aides then render the Flow Sheets to the physical therapists to review and co-sign their initials. The hard copies of the Flow Sheets are maintained in binders specific to each physical therapist in the therapy gym. The Flow Sheets are scanned and uploaded into the patients' charts after discharge. After the visits, physical therapists document progress notes and enter the CPT codes to be billed for the visits in the NextGen system based on the Flow Sheets.

73. Of note, the Flow Sheets do **not** list group therapy CPT codes. This is because PTSI does not bill for group therapy even when treating multiple patients at the same time.

74. An example of a Flow Sheet for a Medicare patient is shown in Image 1 below. The patient received physical therapy for "weakness." The patient was scheduled for twelve (12) treatment visits with Dianne Smith, PT. In reality, the patient was treated by aide Jonathan Short on March 4, 11, 13, 18, and 25, 2025, and by Relator on March 28, 2025. The aides rendered therapy exercises to the patient. The start and end times show that each visit was about an hour long. Diane Smith co-signed the treatments rendered by the aides.

**Image 1**


PHYSICAL THERAPY SPORTS INSTITUTE

FLOW SHEET

[redacted]

General

MODALITIES

MANUAL (97140)

Gait Train (97116)

(97110) Time In

(97110) Time Out

PTA / AIDE INITIALS

PT COSIGN

NEXT MD APPT

Sessions Authorized

PRECAUTIONS

75. Patients are under the impression that aides are physical therapists. Patients ask Relator how long he studied to become a physical therapist or write on the Patient Sign-In Sheets that their appointment is with Relator. Image 2 below shows a Sign-In Sheet

dated December 18, 2024 on which the patient wrote his appointment was with "P.T. Gerardo?" This is because Relator and other aides are the ones instructing/directing and assisting patients with exercises during their visits. When patients confuse him as a physical therapist, Relator clarifies that he is not a physical therapist. Relator has discussed these situations with aide Jonathan Short, who has stated that he, too, is mistaken for a physical therapist while treating patients.

**Image 2**



76. Jeanne Sprinkle, Operations Manager at PTSI, also manages other clinics in the PromiseCare/HCMG network. She works offsite but visits PTSI monthly and has been present in the therapy gym while aides were treating patients independently. During a conversation with Relator and Jonathan Short in the therapy gym in or about May 2025, Jeanne Sprinkle commented that she would never receive treatment at PTSI because "you guys would kill me." Relator does not know the reasoning behind this comment, but Jeanne Sprinkle was in the therapy gym as aides were treating patients that day.

77. On September 15, 2025, at around 3 p.m., Relator had a conversation with Michelle Brown, PT in which she stated that PTSI is the busiest clinic she has worked at, and 15-minute appointments are "unheard of" at other clinics. Relator stated that before aides Alyse Cubain and Litzy Gonzalez started working at PTSI, Relator and Jonathan Short treated as many as seven (7) and nine (9) patients at the same time, respectively.

78. Pamela Scott and Rosie Garcia are PTSI's billers. They work offsite. At least Rosie Garcia is an employee of PromiseCare/KM.

**B. Hiding information from CMS/Medi-Cal representatives during a site visit**

79. On July 30, 2025, CMS/Medi-Cal conducted a site visit at PTSI. The visit was initially scheduled for July 24, 2025, but was rescheduled to the following week. PTSI engaged several protocols in preparation for the visit to hide the fact that aides treat patients independently and that physical therapists/aides treat multiple patients at the same time.

80. On July 23, 2025, Maria Montero, PT sent a text message to the PTSI aides stating, *inter alia*, "Danber will only be in charge of charts, he will not be doing modalities while they are there nor will he be helping out with patients in the gym[.]"

81. On the morning of July 24, 2025, Relator asked Maria Montero, PT what to expect during the upcoming CMS/Medi-Cal visit. Maria Montero replied that she or Michelle Brown, PT will be in the therapy gym during the CMS/Medi-Cal visit to supervise

aides. She also added that aides will not perform modalities during the visit as Medicare does not allow aides to perform modalities.

82. On the morning of July 28, 2025, Relator had a conversation with Michelle Brown, PT in the therapy gym regarding the upcoming CMS/Medi-Cal visit. Jonathan Short was also present in the gym. Michelle Brown stated that, going forward, a physical therapist will try to be present in the therapy gym while aides are treating patients. She added that she will talk to Jeanne Sprinkle, Operations Manager at PTSI, regarding overlapping patient appointments because it is "unacceptable" for aides to treat patients while physical therapists are not available. She added that the situation is "not right" and she and Maria Montero, PT are at risk of losing their licenses.

83. Later that day, around 2 p.m., Michelle Brown, PT updated Relator on her conversation with Jeanne Sprinkle. She said that she told Jeanne Sprinkle that it is dangerous for one physical therapist to supervise three (3) aides, especially if the aides are not competent. She then described an incident involving Alyse Cubain and Patient Thirteen herein, and said she had informed Jeanne Sprinkle of this incident. *See* paragraphs 118-119 for more details.

84. At 3:19 p.m. that same day, on July 28, 2025, Jeanne Sprinkle sent the following message to staff in the NextGen system[13] regarding Alyse Cubain and other matters: "3. Not able to work with more than 1 patient. 4. Friday July 24th [sic] there was an incident where she was giving incorrect instructions for therx [therapy exercise] to a patient causing that patient harm. I will be getting documentation from Michelle about this specific incident. 5. There are times when a PT is NOT in the gym when patients are present. A PT MUST be present at all times. . . ." *See* Patient Thirteen herein. This message confirms that 1) aide Alyse Cubain was treating a patient, 2) physical therapists are not in

---

[13] At that time, before the CMS/Medi-Cal visit, all aides shared one account in NextGen. An earlier NextGen message from Jeanne Sprinkle on June 5, 2025 confirms this.

the therapy gym while aides treat patients, and 3) the expectation is to treat multiple patients at the same time.

85. On the afternoon of July 29, 2025, Michelle Brown, PT scheduled a roundtable discussion with Relator, Alyse Cubain, and Litzy Gonzalez to update them on the CMS/Medi-Cal visit the next day. Michelle Brown stated that during the CMS/Medi-Cal visit, she would personally treat Medicare patients and aides would only be responsible for transporting patients, cleaning, and documenting. She added, however, that this would be impossible to do every day given the physical therapists' patient schedules.

86. On the morning of July 30, 2025, while in the therapy gym, Relator heard Michelle Brown, PT tell Maria Montero, PT: "We cannot bill insurance for patients over 65 for time with aides, unless we bill group. But we don't, so . . ." Relator understood "patients over 65" to mean Medicare patients.

87. On July 30, 2025, Michelle Brown, PT noted the following instructions for the aides: "**2. MC → 65 + MediCal cannot bill for aide time. 1:1 [ineligible] pt. 3. NO data entry in gym w/ PT sign in. 4. Supervision MC [Medicare] MediCal.** 5. 2 Aides per P.T. [physical therapist]" (emphasis added). This note shows knowledge of the wrongful practices and further shows that PTSI therapy staff shared login information.

**Image 3**


1. SPRAY BIKE handles w/ alcohol
2. MC/65 + medical cannot bill for aide time. 1:1 ĉ pt.
3. NO Data entry in gym w/ PT sign in
4. supervision MC medical
5. 2 Aides per P.T.
6. cover clip board no name compute - no names visit

88. Jeanne Sprinkle was present at PTSI during the CMS/Medi-Cal visit. Jeanne Sprinkle instructed Relator during a private meeting to disregard any instruction from Michelle Brown because Michelle Brown "doesn't know what she is talking about." Jeanne Sprinkle asked Relator which patients Michelle Brown considered Medicare patients. Relator replied that, to his understanding, patients who are at least 65 years old. Jeanne Sprinkle replied that aides can treat "Medicare HMO" (Medicare Advantage) patients. She did not comment on whether aides can treat Medicare patients. Ceasar Samoya, who works under Jeanne Sprinkle, was also present during this meeting.

### C. Changes enacted after the CMS/Medi-Cal site visit

89. After the CMS/Medi-Cal visit, Defendants have enacted certain practices to appear compliant. Defendants began scheduling 30-minute appointments (instead of 15-minutes) for Medicare patients *and* having physical therapists treat these patients. As such, the Flow Sheets for these patients no longer list the aides' initials. *See*, *e.g.*, Patients Eleven and Twelve herein. However, in practice, due to the number of patients scheduled daily and

the units billed for each visit, therapists and aides continue to treat multiple patients at the same time and Defendants bill one-on-one CPT codes for these services. In addition, Defendants have indicated that a physical therapist should be present in the therapy gym to supervise aides while aides treat other patients. However, in practice, this does not occur; because patient evaluations and treatment visits overlap, aides continue to treat patients unsupervised. These recent changes show that Defendants knew their practices were and are wrongful.

90. Whereas before aides shared one account in NextGen, after the site visit, each aide has an individual account and login in the NextGen system.

91. Defendants discovered that Michelle Brown, PT was not properly credentialed with certain insurers to treat those insured patients. After the site visit, several of her patients were rescheduled with Maria Montero, PT or Julie-Ann Cuadros, PTA.

**D. Treating knowledgeable patients differently all along**

92. Physical therapists, and not aides, treat patients who are expected to have knowledge of the skilled therapy industry, such as doctors who could refer their patients to PTSI or executives at PromiseCare. For example, a family member of an executive at PromiseCare/HCMG is a patient at PTSI. Maria Montero, PT treated the patient one-on-one and rendered therapy exercises billable under CPT code 97110. These services are otherwise rendered by aides at PTSI.

**E. Patient Examples**

93. The following are examples of patients treated by an aide and/or examples of multiple patients treated simultaneously by a physical therapist/an aide but whose visits were wrongfully billed using one-on-one CPT codes.

*i.* *<u>Dianne Smith's Schedule on 5/28/2024 – Patients One and Two</u>*

94. Dianne Smith, PT was scheduled to treat at least 23 patients and evaluate two (2) patients on May 28, 2024, for a total of 25 patients.

95. Patient One and Patient Two were both scheduled to be treated at the same time by Dianne Smith, PT on May 28, 2024 at 9:45 a.m.

96. Patient One is a Medicare patient. The Flow Sheet shows that the patient's therapy session started at 9:57 a.m. and ended at 10:37 a.m. The Flow Sheet was signed by aide Jonathan Short that day, meaning Jonathan Short treated the patient that day. Dianne Smith, PT co-signed the Flow Sheet. The patient's record shows that PTSI billed $120 for three units of CPT code 97110 (therapy exercises) that day.

97. Patient Two is a SCAN HMO – Medicare and/or Aetna HMO – Medicare patient.[14] The Flow Sheet shows that the patient's therapy session started at 9:45 a.m. and ended at 10:17 a.m. The Flow Sheet was signed by aide Jonathan Short that day, meaning Jonathan Short treated the patient that day. Dianne Smith, PT co-signed the Flow Sheet. The patient's record shows that PTSI billed $80 for two units of CPT code 97110 (therapy exercises) that day.

98. The treatment sessions of Patient One and Patient Two overlapped for 20 minutes (from 9:57 a.m. to 10:17 a.m.) that day. Given the total number of patients scheduled that day, it is possible that Patient One and Patient Two's treatments also overlapped with other patients. Despite this, PTSI billed direct, one-on-one CPT codes for each visit for treatments rendered by aide Jonathan Short.

*ii. Dianne Smith's Schedule on 3/19/2025 – Patients Three and Four*

99. Dianne Smith, PT was scheduled to treat 13 patients and evaluate two (2) patients on March 19, 2025, for a total of 15 patients. Patient Three and Patient Four were both scheduled to be treated by Dianne Smith at the same time, on March 19, 2025 at 1:45 p.m.

---

[14] The patient's records list both insurances. Relator does not know if both are active plans or if one of the listed plans is an old plan.

100. Patient Three is a Medicare and IEHP Medi-Cal patient. The Flow Sheet shows that the patient's therapy session started at 1:54 p.m. and ended at 2:40 p.m. The Flow Sheet was signed by aide Jonathan Short that day, meaning Jonathan Short treated the patient that day. Dianne Smith, PT co-signed the Flow Sheet. The patient's record shows that PTSI billed $120 for three units of CPT code 97110 (therapy exercises) that day.

101. Patient Four is an IEHP[15] patient. The Flow Sheet shows that the patient's therapy session started at 1:49 p.m. and ended at 2:22 p.m. The Flow Sheet was signed by aide Jonathan Short, meaning Jonathan Short treated the patient that day. Dianne Smith, PT co-signed the Flow Sheet. The patient's record shows that PTSI billed $80 for two units of CPT code 97110 (therapy exercises) that day.

102. The treatment sessions of Patient Three and Patient Four overlapped for 28 minutes (from 1:54 p.m. to 2:22 p.m.) that day. Despite this, PTSI billed direct, one-on-one CPT codes for each visit for treatments rendered by aide Jonathan Short.

*iii.* *Michelle Brown's Schedule on 5/22/2025 – Patients Five and Six*

103. Michelle Brown, PT was scheduled to treat 16 patients and evaluate two (2) patients on May 22, 2025, for a total of 18 patients. Patient Five and Patient Six were scheduled to be treated by Michelle Brown at the same time, on May 22, 2025 at 9:45 a.m.

104. Patient Five is SCAN Health Plan HMO – Medicare patient. The Flow Sheet shows that the patient's therapy session started at 10:04 a.m. and ended at 10:54 a.m. Relator signed the Flow Sheet for therapy exercises billable under CPT code 97110, meaning Relator treated the patient that day. The Flow Sheet shows that the patient also received manual therapy that day. Physical therapists perform manual therapy at PTSI. Michelle Brown, PT co-signed the Flow Sheet. The patient's record shows that PTSI billed

[15] IEHP is a Medicaid MCO in California.

$120 for three units of CPT code 97110 (therapy exercises) *and* an additional $75 using CPT code 97140 (manual therapy) in a 50-minute-long visit that day.

105. Patient Six's records show that PTSI billed $120 for three units of CPT code 97110 (therapy exercise) *and* an additional $75 using CPT code 97140 (manual therapy) that day.

106. The treatment sessions of Patient Five and Patient Six overlapped that day. Despite this, PTSI billed direct, one-on-one CPT codes for each visit. In addition, Relator treated Patient Five that day by rendering therapy exercises.

*iv.* *Patient Seven*

107. Patient Seven is a CHAMPVA patient. She was scheduled to receive treatment with Maria Montero, PT between February and May 2025.

108. The Flow Sheets were signed by Relator on February 21, March 10, and March 12, 2025, showing that Relator treated the patient on those dates. The Flow Sheets were signed by Jonathan Short on March 18 and 20, April 9, 16, 21, 23, and May 5 and 8, 2025, showing that Jonathan Short treated the patient on those dates. The Flow Sheet was signed by Danber De Los Santos on March 25, 2025, showing that Danber De Los Santos treated the patient that date. The Flow Sheets were co-signed by Maria Montero, PT.

109. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) and $45 for Code G0283 (electrical stimulation) on February 21, 2025. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) and $45 for Code G0283 (electrical stimulation) on March 10, 2025. PTSI billed $80 for two (3) units of CPT code 97110 (therapy exercises) and $45 for Code G0283 (electrical stimulation) on March 12, 2025. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) and $45 for Code G0283 (electrical stimulation) on March 18, 2025. PTSI billed $160 ($120 + $40) for four (4) units of CPT code 97110 (therapy exercises) March 20, 2025. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) on March 25, 2025. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) on April 9, 2025. PTSI

billed $80 for two (2) units of CPT code 97110 (therapy exercises) on April 16, 2025. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) on April 21, 2025. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) and $75 for CPT code 97140 (manual therapy) on April 23, 2025. PTSI billed $160 for four (4) units of CPT code 97110 (therapy exercises) and $75 for CPT code 97140 (manual therapy) on May 5, 2025. PTSI billed $160 for four (4) of CPT code 97110 (therapy exercises) on May 8, 2025. PTSI billed for therapy exercises rendered by aides.

*v.* *Patient Eight*

110. Patient Eight is a Medicare patient. The patient was scheduled to receive treatment with Maria Montero, PT in September 2024. The Flow Sheet shows that the patient was treated by Relator on September 4, 11, 18, and 25, 2024, as Relator signed the Flow Sheet on each of the listed dates. Maria Montero, PT co-signed the Flow Sheet on each of those dates. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) on each of those dates for services rendered by an aide.

*vi.* *Patient Nine*

111. Patient Nine is a TRICARE patient. The patient was scheduled to receive treatment with Maria Montero, PT in May 2025. The patient previously received treatment at PTSI in June and July 2024. The patient was evaluated again on May 12, 2025, and PTSI billed $150 for CPT code 97162 for the evaluation. The Flow Sheet shows that the patient was then treated by Relator on May 14 and 16, 2025, as Relator signed the Flow Sheet on each of the listed dates. The patient was treated by Litzy Gonzales on May 22, 2025. Maria Montero, PT co-signed the Flow Sheet on each of those dates. PTSI billed $80 for two (2) units of CPT code 97110 (therapy exercises) on each of those dates for services rendered by an aide.

*vii.* *Patient Ten*

112. Patient Ten is a TRICARE patient. The patient was scheduled to receive treatment with Maria Montero, PT in May and June 2024. The Flow Sheet shows that the

patient was treated by Relator in May[16] and on June 6 and 13, 2024, as Relator signed the Flow Sheet on each of the listed dates. Maria Montero, PT co-signed the Flow Sheet on each of those dates. PTSI billed $160 for four (4) units of CPT code 97110 (therapy exercises) on June 6, 2025 for services rendered by an aide. PTSI billed $120 for three (3) units of CPT code 97110 (therapy exercises) on June 13, 2025 for services rendered by an aide.

*viii.* *Patients Eleven and Twelve*

113. On August 12, 2025, Michelle Brown, PT treated Patient Eleven and Patient Twelve simultaneously but billed direct, one-on-one CPT codes for each visit. Pursuant to PTSI's changed practices following the CMS/Medi-Cal visit in July 2025, Michelle Brown treated these patients so no aides were listed on the Flow Sheets.

114. Patient Eleven is a Medicare patient. The patient's appointment was scheduled for 8 a.m. The Flow Sheet shows that the patient's therapy session started at 8:10 a.m. and ended at 9:08 a.m. PTSI billed $160 for four (4) units of CPT code 97110 (therapy exercises) that day. Billing four (4) units is equal to rendering 53-67 minutes of physical therapy.

115. Patient Twelve is a TRICARE patient. The patient's appointment was scheduled for 8:30 a.m. The Flow Sheet shows that the patient's therapy session started at 8:31 a.m. and ended at 9:25 a.m. PTSI billed $160 for four (4) units of CPT code 97110 (therapy exercises) that day. Billing four (4) units is equal to rendering 53-67 minutes of physical therapy.

116. The treatment sessions of Patient Eleven and Patient Twelve overlapped for 35 minutes that day (8:31 a.m. to 9:08 a.m.). Despite this, PTSI billed direct, one-on-one CPT codes for each visit.

[16] The date on the Flow Sheet is not legible.

117. This example also shows that, even though patient appointments may not overlap on the calendar (as here, the appointments were scheduled for 8 a.m. and 8:30 a.m.), in practice, patients are treated simultaneously.

*ix.* *Patient Thirteen*

118. Patient Thirteen is a United Healthcare HMO – Medicare patient. The patient was scheduled to receive therapy with Michelle Brown, PT on July 25, 2025. In reality, the patient was treated by aide Alyse Cubain. On July 28, 2025, Michelle Brown explained to Relator that Alyse Cubain taught an exercise incorrectly while treating the patient and the patient exclaimed in pain. Michelle Brown had to apologize to the patient for the incident. Michelle Brown told Relator that she is concerned that Alyse Cubain did not know how to instruct the patient on a basic exercise or didn't consult with the therapist for help, which caused the patient pain and a potential injury. Michelle Brown informed Jeanne Sprinkle of this incident and Jeanne Sprinkle sent a message to follow up with staff. *See* paragraphs 83-84 for more information.

119. The Progress Report of July 25, 2025 by Michelle Brown states: "Pt reports 6/10 pain today L shoulder . . . Tx [therapy] per flow chart. Pt was complaining of pain with table ER passively which technique was corrected. Pt needs MOD [moderate] VC [verbal cues] t/o [throughout] session for therex [therapy exercises]. Pt is having endrange pain L [left] SH [shoulder] with PROM [passive range of motion] exercises which is expected." Michelle Brown failed to document in the visit notes that the patient experienced pain during treatment rendered by an aide.

## VII. PERIOD OF WRONGDOING

120. Defendants have engaged in the practices described above for several years. When Relator started working at PTSI in October 2023, the practices were already in place and well established. Relator had worked at another physical therapy company before working at PTSI but had not treated patients; he worked in the data integrity department. Danber De Los Santos, Lead Aide who is *not* a licensed physical therapist, trained Relator

right away on how to perform therapy exercises with patients. Aides Jonathan Short and Elizabeth Mendoza were already treating patients independently at that time. Danber De Los Santos also trained recently hired aides Alyse Cubain and Litzy Gonzalez. Danber De Los Santos has worked at PTSI for approximately four years.

121. Dianne Smith, former physical therapist at PTSI, worked at the company before it was acquired by PromiseCare. The entity changed its name from Physical Therapy-Sports Institute, Dennis L. Rohrig, P.T. & Associates, Inc. to PTSI in June 2012. The Certificate of Amendment changing the entity's name was signed by Michael Foutz, current CEO/President/CFO at PTSI, Member of PromiseCare/KM, and CFO at PromiseCare/HCMG. Dianne Smith has commented to Relator that before the acquisition, physical therapists rendered one-on-one treatment to patients and aides primarily handled cleaning. Relator and Dianne Smith were discussing how many physical therapists have worked at PTSI, and Dianne Smith stated, "At that time, therapists did all their own treatment and aides just cleaned equipment." Jonathan Short joined the conversation, stating: "That sounds like a dream job, imagine all we had to do was clean equipment." This suggests that PromiseCare implemented the wrongful practices described herein when it acquired PTSI.

**<u>COUNT I: FALSE OR FRAUDULENT CLAIMS</u>**

**31 U.S.C. § 3729(a)(1)(A)**

122. Relator repeats and re-alleges each allegation in paragraphs 1 through 121 as if fully set forth herein.

123. Defendants knowingly or in deliberate ignorance or reckless disregard of the truth presented or caused to be presented false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendants presented or caused to be presented claims for payment to Medicare, California Medicaid, Medicare Advantage Organizations, Medicaid Managed Care Organizations, TRICARE, and CHAMPVA for services that did not occur as Defendants reported them

to have occurred, as described herein. Medicare, California Medicaid, Medicare Advantage Organizations, Medicaid Managed Care Organizations, TRICARE, and CHAMPVA unaware of Defendants' fraudulent practices, paid for these claims.

124. By virtue of the false or fraudulent claims Defendants knowingly presented or caused to be presented, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty (as adjusted for inflation) for each and every false claim.

## COUNT II: FALSE STATEMENTS MATERIAL TO FALSE CLAIMS

## 31 U.S.C. § 3729(a)(1)(B)

125. Relator repeats and re-alleges each allegation in paragraphs 1 through 121 as if fully set forth herein.

126. Defendants knowingly or in deliberate ignorance or reckless disregard of the truth made, used or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). Defendants, in submitting or causing the submission of claims to Medicare, California Medicaid, Medicare Advantage Organizations, Medicaid Managed Care Organizations, TRICARE, and CHAMPVA, falsely certified that the services were true as reported and in compliance with all applicable laws and regulations. These certifications were false because the services did not occur as Defendants reported them to have occurred, as described herein. The government relied on those false statements and paid the fraudulent claims. The misrepresentations were material as the term is defined in the False Claims Act and interpreted by the courts.

127. By virtue of the false records or statements Defendants made, used, or caused to be made or used, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty (as adjusted for inflation) for each and every false claim.

## COUNT III: REVERSE FALSE CLAIMS ACT

**31 U.S.C. § 3729(a)(1)(G)**

128. Relator repeats and re-alleges each allegation in paragraphs 1 through 121 as if fully set forth herein.

129. Since *at least* July 2025, Defendants knowingly made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States. When CMS/Medi-Cal conducted a site visit in July 2025, PTSI engaged several protocols in preparation for the visit to hide its practices. Internal communications instructed rendering one-on-one treatment to Medicare and Medi-Cal patients and required physical therapists to be present in the therapy gym to supervise aides during the CMS/Medi-Cal visit. Following the CMS/Medi-Cal visit, Defendants enacted certain changes to appear compliant. However, in practice, at least some of the wrongful practices are ongoing. The changes in anticipation of the site visit show that Defendants knew or should have known at least by then that their practices were fraudulent, and that they had received monies to which they were not entitled. Nevertheless, Defendants did not return such overpayments to Healthcare Programs and continued to wrongfully bill Healthcare Programs, as described herein.

130. Such false records or statements or knowing concealment, avoidance, or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(b)(1). Failure to return any overpayment such as the claims on which Defendants received any overpayment from Healthcare Programs constitutes a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

131. By virtue of Defendants' conduct, the United States has suffered actual damages in an amount to be proven at trial. The United States is entitled to recover treble damages plus a civil monetary penalty (as adjusted for inflation) for each and every false claim.

**COUNT IV: VIOLATIONS OF CALIFORNIA FALSE CLAIMS ACT**

**Cal. Gov't Code §§ 12651(a)(1), (2), (7)**

132. Relator repeats and re-alleges each allegation in paragraphs 1 through 121 as if fully set forth herein.

133. Defendants knowingly or in deliberate ignorance or reckless disregard of the truth presented or caused to be presented false or fraudulent claims for payment or approval, in violation of the California False Claims Act, Cal. Gov't Code § 12651(a)(1). Specifically, Defendants presented or caused to be presented claims for payment to California Medicaid for services that did not occur as Defendants reported them to have occurred, as described herein. California Medicaid, unaware of Defendants' fraudulent practices, paid for these claims.

134. In addition, Defendants knowingly or in deliberate ignorance or reckless disregard of the truth made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the California False Claims Act, Cal. Gov't Code § 12651(a)(2). Defendants, in submitting or causing the submission of claims to California Medicaid, falsely certified that the services were true as reported and in compliance with all applicable laws and regulations. These certifications were false because the services did not occur as Defendants reported them to have occurred, as described herein. The State of California relied on those false statements and paid the fraudulent claims. The misrepresentations were material as the term is defined in the California False Claims Act and interpreted by the courts.

135. Furthermore, since *at least* July 2025, Defendants knowingly made and used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the State of California, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the State of California. When CMS/Medi-Cal conducted a site visit in July 2025, PTSI engaged several protocols in preparation for the visit to hide its practices. Internal communications instructed rendering one-on-one treatment to California Medicaid patients and required physical therapists to be present in

the therapy gym to supervise aides during the CMS/Medi-Cal visit. Following the CMS/Medi-Cal visit, Defendants enacted certain changes to appear compliant. However, in practice, at least some of the wrongful practices are ongoing. The changes in anticipation of the site visit show that Defendants knew or should have known at least by then that their practices were fraudulent, and that they had received monies to which they were not entitled. Nevertheless, Defendants did not return such overpayments to California Medicaid and continued to wrongfully bill California Medicaid, as described herein. Such false records or statements or knowing concealment, avoidance, or decrease of an obligation to pay or transmit money to the State of California were made or done knowingly, as defined in Cal. Gov't Code § 12650(b)(3). Failure to return any overpayments, such as the claims on which Defendants received from California Medicaid, constitutes a reverse false claim under Cal. Gov't Code § 12651(a)(7) of the California False Claims Act.

136. By virtue of Defendants' conduct, the State of California has suffered actual damages in an amount to be proven at trial. The State of California is entitled to recover treble damages plus a civil monetary penalty (as adjusted for inflation) for each and every false claim.

## PRAYER FOR RELIEF

WHEREFORE, Relator hereby prays that judgment be entered in favor of the United States, the State of California, and Relator as follows:

1. On Counts I, II, and III, enter judgment against Defendants, jointly and severally, for three times the amount of damages sustained by the United States because of the acts of Defendants;
2. On Counts I, II, and III, enter judgment against Defendants, jointly and severally, for the maximum civil penalties as required by law, adjusted for inflation, for each violation of the False Claims Act committed by Defendants;

3. On Count IV, enter judgment against Defendants, jointly and severally, for three times the amount of damages sustained by the State of California because of the acts of Defendants;
4. On Count IV, enter judgment against Defendants, jointly and severally, for the maximum civil penalties as required by law, adjusted for inflation, for each violation of the California False Claims Act committed by Defendants;
5. Award Relator a percentage of the proceeds of the action in accordance with the False Claims Act, 31 U.S.C. § 3730(d);
6. Award Relator a percentage of the proceeds of the action in accordance with the California False Claims Act, Cal. Gov't Code § 12652(g)(2)-(3);
7. Award Relator his costs and reasonable attorneys' fees, costs, and expenses for prosecuting this action; and
8. All other relief as may be required or authorized by law in the interest of justice.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself, the United States, and the State of California, demands a jury trial on all claims alleged herein.

Date: December 9, 2025

Respectfully submitted,

Sarah P. Alexander (CA Bar No. 291080)
WHISTLEBLOWER PARTNERS LLP
1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Tel: (415) 707-6867
poppy@whistleblower.law

Brian Olney (CA Bar No. 298089)
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue

Pasadena, CA 91103
Tel: (626) 585-9600
bolney@hadsellstormer.com

Jeffrey A. Newman, Esq. (MA Bar No. 370450)
(*Pro Hac Vice* forthcoming)
JEFF NEWMAN LAW
One Story Terrace
Marblehead, MA 01945
Tel: (617) 823-3217
jeff@jeffnewmanlaw.com

*Attorneys for Relator*